(No. 64382.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN WAYNE GACY, Appellant.

*Opinion filed September 29, 1988.—Rehearing denied December 5, 1988.*

120

Richard S. Kling, of Chicago, and Thomas Ost, Laura Monahan and Jomarie Fredericks, law students, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (James S. Veldman and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

This case involves the petition of the defendant, John Wayne Gacy, under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1985, ch. 38, par. 122—1 *et seq.*), challenging his convictions and sentences. In the circuit court of Cook County, after a trial by jury, the defendant was tried and convicted of murdering 33 boys and young men. He was also found guilty of one count of deviate sexual assault, and a second count of indecent liberties with a child. For 12 of these murders, the State sought and obtained the death penalty, the jury finding the existence of one or more of the statutory aggravating circumstances and that no mitigating circumstances precluded the imposition of death (Ill. Rev. Stat. 1979, ch.

38, par. 9—1). The defendant was sentenced to imprisonment for his natural life on the remaining murder charges. On direct appeal to this court, his convictions and sentences were affirmed (103 Ill. 2d 1), and his petition for writ of *certiorari* was denied by the Supreme Court of the United States (470 U.S. 1037, 84 L. Ed. 2d 799, 105 S. Ct. 1410). His subsequent petition for post-conviction relief was dismissed without an evidentiary hearing in the circuit court of Cook County, and this appeal followed (107 Ill. 2d R. 651).

The factual background of this case is recited at length in the defendant's direct appeal, and need not be repeated here. On this appeal the defendant raises five principal claims of error: (1) that his trial counsel's failure to present any evidence in mitigation deprived him of the effective assistance of counsel at his sentencing hearing, (2) that his trial counsel's failure to make offers of proof as to which of the defendant's statements to his expert psychiatric witnesses would have been offered into evidence had not the trial court precluded the defendant from doing so deprived the defendant of the effective assistance of counsel, (3) that the trial judge erred by precluding the defendant's psychiatric witnesses from testifying as to the defendant's statements to them, (4) that his trial counsel's failure to request that the jury be sequestered during the five- to nine-day period after their selection and before trial deprived the defendant of the effective assistance of counsel, and (5) that his death sentence is unconstitutional on account of a variety of facial deficiencies in the Illinois death penalty statute. Acting *pro se*, the defendant has also filed a supplementary petition for post-conviction relief, to which are attached two letters which list 43 (numbered "1" to "43A," with no number "33") additional issues he claims entitle him to post-conviction relief. As to each

claim he maintains that the circuit court erred by dismissing his petition without any evidentiary hearing.

The State claims that all of these allegations of error were decided against the defendant on his direct appeal and are therefore barred on his post-conviction petition by *res judicata.* (See *People v. Kubat* (1986), 114 Ill. 2d 424, 436.) Since, however, this is a death case, and since in any case we find no merit in any of the defendant's allegations, we need not consider whether they are barred.

Under the Post-Conviction Hearing Act, a defendant is only entitled to an evidentiary hearing if the allegations of his petition, together with the record of his trial and supporting affidavits, make a substantial showing of a violation of his constitutional rights. (*People v. Silagy* (1987), 116 Ill. 2d 357, 365.) We find that the defendant has not made such a showing as to any of his allegations.

The defendant first argues that his defense counsel's failure to present any mitigating evidence at his sentencing hearing denied him the effective assistance of counsel. We find no merit in this argument. The standard for ineffective assistance at a sentencing hearing is the two-prong standard enunciated in *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064. Under this standard, the defendant must prove: (1) that his counsel's representation was so deficient that his counsel was not functioning as the "counsel" guaranteed the defendant by the sixth amendment, and (2) that this deficient performance so prejudiced the defendant as to deprive him of a fair hearing. The defendant's petition does not adequately allege either deficiency or prejudice.

The standard for assessing claimed deficiencies in an attorney's performance is that of "reasonably effective assistance," which is within the "range of competence

demanded of attorneys in criminal cases." The standard is one of objective reasonableness, under "prevailing professional norms." (466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65.) To establish a deficiency, the defendant must overcome the strong presumption that the challenged action or lack of action might be the product of " 'sound trial strategy.' " (466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) At death sentencing hearings, decisions not to present mitigating evidence will not be deemed incompetent if they stem from a theory of defense which does not require the use of mitigating evidence (466 U.S. at 699, 80 L. Ed. 2d at 700-01, 104 S. Ct. at 2070 (reliance upon extreme emotional distress mitigating circumstance)), or from a theory which might be adversely affected by the use of such evidence (*Burger v. Kemp* (1987), 483 U.S. 776, 793-94, 97 L. Ed. 2d 638, 656-57, 107 S. Ct. 3114, 3125-26).

We acknowledge that there may be cases in which counsel's failure to present mitigating evidence does not flow from a reasonable alternative strategy and will therefore be deemed incompetent. (Compare *People v. Gaines* (1984), 105 Ill. 2d 79, *People v. Kubat* (1983), 94 Ill. 2d 437, and *People v. Lewis* (1981), 88 Ill. 2d 129, with *Gaines v. Thieret* (N.D. Ill. 1987), 665 F. Supp. 1342, *rev'd on other grounds* (7th Cir. 1988), 846 F.2d 402, *United States ex rel. Kubat v. Thieret* (N.D. Ill. 1988), 679 F. Supp. 788, and *Lewis v. Lane* (7th Cir. 1987), 832 F.2d 1446; see also *Blake v. Kemp* (11th Cir. 1985), 758 F.2d 523.) This, however, is not such a case.

The evidence which the defendant now claims should have been presented in mitigation includes both statutory and nonstatutory mitigation. In support of the statutory mitigating factor of extreme mental or emotional disturbance, the defendant now claims that his attorney should have recalled the psychiatric witnesses who testified at trial, and who indicated their belief that the

defendant murdered while under extreme mental or emotional disturbance. The defendant also claims that his trial counsel should have introduced evidence of non-statutory mitigation, including evidence of his traumatic childhood, warm relationships with family members and friends, success in business, political, and civic affairs, and his good behavior while in prison awaiting trial. In addition, he claims that a relative of one of the deceased victims wrote a letter forgiving him, which might also have been presented in mitigation.

Both claims are substantially weakened by the fact that much of this evidence was actually presented at trial, and all evidence at trial was admitted by stipulation at the death penalty hearing. In fact, in his closing argument at the sentencing hearing, trial counsel used the psychiatric evidence to argue that the defendant had acted while under extreme mental or emotional disturbance. As we stated on the defendant's direct appeal, we believe that counsel could reasonably have believed that the jurors would not have been impressed, and might actually have been irritated, by a pointless rehash of the lengthy testimony they had already heard at trial.

In response, the defendant argues that consideration of the jury's reaction to the repetition of this testimony is "unwarranted speculation," and somehow usurps the jury's function of hearing evidence. This argument misses the point. The burden of proving incompetence, and of overcoming the presumption that an attorney's decision is the product of "sound trial strategy," rests upon the defendant, not the State. Trial strategy is less a science than an art. An attorney is entitled to speculate as to how a jury will react to the presentation of evidence. An attorney's reasoned judgment that a jury will be bored or fatigued by unnecessary repetition is both natural and commonplace. The State is not obligated to prove that such a judgment is correct. Nor has the

defendant provided any argument as to why we should consider such a judgment unreasonable.

The defendant's argument with respect to nonstatutory mitigation is similarly unavailing. Again, a reasonable attorney might have concluded that the jury would be irritated by the repetition of this evidence, most of which it had heard already at trial. The fact that defense counsel did not refer to this evidence in closing argument does tend to suggest that he did not believe that it would have much value as mitigation. But even this judgment would not have been unreasonable. As we pointed out on defendant's direct appeal, albeit in a different context, much of this evidence was "questionable." (103 Ill. 2d at 102.) Evidence that the defendant led a double life, engaging in charitable and political activities at the same time he was committing a series of sadistic torture murders, might have been reasonably viewed by counsel as tending to exacerbate rather than mitigate his offense in the minds of the jurors. The same could be said of evidence that the defendant was a good husband and stepfather to his second wife and their children. Moreover, even this evidence was not unambiguously helpful: many witnesses testified that the defendant's business and social activities were motivated by a desire to manipulate others and gain an advantage for himself. Similarly, counsel might reasonably have feared that testimony as to the defendant's unhappy childhood could be viewed as a vain attempt to excuse or justify these horrendous crimes.

Our determination is influenced by the fact that counsel's closing argument tends to suggest that his failure to dredge up these facts or make use of them was based not on laziness or incompetence but upon a reasonable strategic choice. Instead of arguing that the "good" aspects of the defendant's character and actions made death an inappropriate penalty for a series of sadistic

torture murders, the defendant's counsel chose to focus instead on other things. By arguing that the defendant acted under the influence of extreme emotional disturbance, he implied that the defendant's acts were not the kind which could be deterred by the imposition of death. By proposing that the societal interest in keeping the defendant alive for scientific study outweighed its interest in taking revenge, he suggested a principled basis upon which even a juror who was unsympathetic to the defendant might find mitigating factors sufficient to preclude the imposition of death. Given the horrific character of the crimes and the age of some of the victims, the decision to make these arguments, rather than to "call *** one witness to attempt to 'pull at the heartstrings' of the only-one-juror necessary to vote for no-death," was not unreasonable.

For these reasons, the decision of *Blake v. Kemp* (11th Cir. 1985), 758 F.2d 523, heavily relied upon by the defendant, is distinguishable. In that case defense counsel testified that he made no preparation for the penalty phase of the trial because he believed that the defendant would be found not guilty by reason of insanity. Counsel further admitted that he made no effort even to ascertain whether mitigating evidence was available. (758 F.2d at 533-35.) Here, in contrast, counsel's decision to proceed with the sentencing hearing without asking for a continuance, and not to present mitigating evidence, appears to have stemmed from his reasonable decision to rely upon mitigating evidence already presented and not from a belief that the defendant would be found not guilty.

For similar reasons, *Gaines v. Thieret* (N.D. Ill. 1987), 665 F. Supp. 1342, *rev'd on other grounds* (7th Cir. 1988), 846 F.2d 402, *United States ex rel. Kubat v. Thieret* (N.D. Ill. 1988), 679 F. Supp. 788, and *Lewis v. Lane* (7th Cir. 1987), 832 F.2d 1446, are also distinguish-

able. (While none of these cases are mentioned in the defendant's brief, the defendant did rely on *Gaines* in oral argument; similar issues were raised in *Lewis* and *Kubat*.) In *Gaines*, unlike here, the defendant presented no evidence at his trial. (See *People v. Gaines* (1981), 88 Ill. 2d 342, 348.) Rather than presenting an alternative theory of mitigation, counsel gave a one paragraph argument which merely asked the jury not to "kill Dickey Gaines." (*Gaines*, 665 F. Supp. at 1365.) In *Kubat*, similarly, the defendant relied at trial on a defense of alibi (679 F. Supp. at 805), which would not aid in the establishment of mitigation. The defendant's counsel also compounded his failure to present available mitigation evidence by also failing to object to erroneous jury instructions and by presenting a "rambling, incoherent discourse" in closing argument. (679 F. Supp. at 812-14.) In *Lewis*, defense counsel's principal error lay in failing to object to the admission of the erroneous statement that the defendant had four previous felony convictions (832 F.2d at 1458), and, as in *Gaines*, the defendant did not present any evidence at trial (88 Ill. 2d at 141).

Even were we to assume that counsel's performance was deficient, we do not believe that the defendant has adequately alleged prejudice. Under *Strickland*, a defendant who proves that his counsel's performance fell below prevailing professional norms must also prove that there is a "a reasonable probability that, absent the errors, the sentencer *** would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) The defendant appears to argue that if presentation of some of the mitigating evidence "*might have* convinced the jury that [the defendant] was not the totally reprehensible person they thought he was" (emphasis in original), prejudice has been shown. The defendant is mistaken. The *Strickland* standard re-

quires a reasonable probability of a different result, not merely a possibility. This standard is not easy to apply to capital sentencing hearings, where the jury is being asked to weigh aggravation and mitigation so as to determine whether the defendant deserves death. But given the dubious character of the unpresented mitigating evidence and the overwhelming nature of the aggravating evidence, we cannot conclude that the jury's decision would have been any different had the defendant's counsel acted as the defendant now wishes that he had.

The defendant's next two points both relate to expert psychiatric testimony at trial. They are most easily considered together. Relying on *People v. Hester* (1968), 39 Ill. 2d 489, the trial judge ruled that the expert witnesses for the State would be allowed to recount statements made to them by the defendant, but the defendant's expert witnesses would not. The rationale for the *Hester* rule was to prevent the defendant's experts from becoming conduits by which the defendant's self-serving hearsay declarations might be conveyed to the jury. In our opinion on the defendant's direct appeal, we noted that, despite the trial court's ruling, the defendant's experts were permitted to testify in substance as to what the defendant said to them. While the experts were generally not allowed to quote the defendant directly, they were often permitted to convey the substance of his statements through paraphrases, answers to hypothetical questions, and narrative recitation of information provided by the defendant in their conversations with him. Other statements of the defendant were introduced through cross-examination of the State's experts. While noting that *Hester*'s validity was questionable (103 Ill. 2d at 70-73), we concluded that the substantial admission of the defendant's statements in so far as they were needed to explain the basis upon which his experts formed their opinions precluded us from considering

whether the trial judge's ruling was in error. In other words, we determined that any possible error was harmless.

Since our holding in the defendant's direct appeal, we have overruled *Hester* and held that a psychiatric expert may not be precluded from relating statements made to him by the defendant which figure in his diagnosis. (*People v. Anderson* (1986), 113 Ill. 2d 1, 12-13.) It is thus now clear that the trial judge's ruling was in error. It is still not reversible error, however, because, for the reasons just given, it did not prevent the defendant's psychiatric witnesses from providing the basis for their opinions. Therefore the defendant's contention that this error mandates the granting of his petition is without merit.

In a related contention, the defendant asserts that his trial counsel's failure to make any offer of proof as to which of the defendant's statements his experts would have related had they been allowed to do so deprived him of the effective assistance of counsel. It is true that our finding of harmlessness was partially premised upon defense counsel's failure to make such an offer. But the difficulty with this argument is that the defendant has *still* not specifically alleged or demonstrated by affidavit which statements should have been included in the offer of proof. Without knowing the content of these statements, it is impossible to determine whether the failure to make an offer of proof constituted ineffective assistance under the *Strickland* standard. Therefore, the defendant has failed to make a substantial showing of a violation of his constitutional rights sufficient for an evidentiary hearing.

In his fourth argument, the defendant contends that the failure of the trial court to sequester the jury between the time of their selection and the beginning of the trial deprived him of a fair and impartial jury. Alter-

natively, he argues that his attorney's failure to request such sequestration deprived him of the effective assistance of counsel. These arguments were made on the defendant's direct appeal, and they have not improved with age. As on his direct appeal, defendant asserts that the jurors might have been exposed to prejudicial publicity during this short period but provides no specific instance of such publicity. In any case, the decision as to whether to sequester a jury rests within the sound discretion of the trial judge, and will not be questioned absent a showing of prejudice. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 355.) The fact that other States provide in capital cases for mandatory sequestration upon the defendant's request is not pertinent. Since immediate sequestration would have placed a great burden on the jurors, who were being asked to leave Winnebago County for a lengthy trial in Cook County, it was not unreasonable for defense counsel to decide not to seek such sequestration. Since counsel's performance was not deficient, the first prong of the *Strickland* test has not been met, and this allegation also is without merit.

In his fifth argument, the defendant reraises a number of challenges to the constitutionality of the Illinois death penalty statute which have been rejected many times in the past. We have previously held that the statute is not unconstitutional on account of allegedly inadequate safeguards against the arbitrary or capricious imposition of death (*People v. Shum* (1987), 117 Ill. 2d 317), improper placement of the burden of proof at the second stage of the death penalty hearing (*People v. Whitehead* (1987), 116 Ill. 2d 425), and the absence of a requirement that the jury specifically find death to be an appropriate punishment (*People v. Christiansen* (1987), 116 Ill. 2d 96). Nothing in the defendant's brief provides any ground for reconsideration which has not been considered and rejected before.

We now come to the 43 additional claims of error which are raised by the defendant *pro se*. In the evaluation of these claims we have been handicapped by the reluctance of the attorneys representing the State and the defendant to comment upon or respond to them. The defendant's counsel's brief, in its sixth point, states that "some of those issues would have entitled [the defendant] either to an evidentiary hearing or other post-conviction relief," but does not identify which issues counsel believes meritorious or provide any authority in support of them. At oral argument, defendant's counsel admitted that some of these allegations were "preposterous," but maintained that others—he cited specifically the allegations which the defendant has numbered 1, 3, and 10— were in his opinion meritorious. The attorney for the State in his brief also has declined to address any of the *pro se* claims, maintaining that these issues have been waived by defense counsel's failure in his brief to cite any authority in their support or to argue otherwise in their favor. The State also argues generally that the allegations in the *pro se* letters are "devoid of argument, devoid of citations of authority, and for the most part devoid of specific factual allegations." Like defense counsel, the attorney for the State has declined to address the merits of any these issues in his brief, although he did respond briefly to some of them in oral argument.

Keeping in mind that the defendant's life is at stake, we do not believe that it would be wise for us to follow the course charted by the attorneys for the defendant and the State. While it might be argued that these claims have been waived on appeal by defense counsel's perfunctory endorsement of them in his brief, it is not true, as the counsel for the State argues, that *all* of the issues raised in the *pro se* letters are devoid of argument, authority, and specific factual allegations. Some of the allegations contain citations to authority. Others re-

fer to cases whose identity is clear from the context even in the absence of citation. All of the arguments are without merit, but not all are frivolous or inconsequential. And while in some instances the factual allegations are so lacking in specificity as to justify dismissal of the defendant's petition on that basis alone, others contain the proper measure of factual detail. We therefore consider the *pro se* allegations, grouping them together into appropriate categories.

A number of the defendant's allegations concern alleged "conflicts of interest" on the part of his trial counsel. While most of these are in reality claims of incompetence, one, in particular does genuinely relate to a supposed conflict of interest. This is the claim (No. 3) that his attorney "was offered a book deal in April 1979, [and that] even while he refused to accept this offer the seed was planted as to how much money was or could be made. The offer was six million for book rights. From that point forward, [trial counsel's] main concern was making and keeping records, as he called it; 'To preserve the record for a book.' Tapes were made on all previously covered conversations, all writing by the defendant was taken and kept by the defense attorney even after trial. He was more concern[ed] with that then preparation for the defense."

Had trial counsel actually accepted this alleged "book offer," this claim would be worthy of serious consideration. Under our Rule 5—104(b) (107 Ill. 2d R. 5—104(b)):

> "Prior to the conclusion of all aspects of the matter giving rise to his employment, a lawyer shall not enter into any arrangement or understanding with a client or a prospective client by which he acquires an interest in publication rights with respect to the subject matter of his employment or proposed employment."

The rationale for this rule is that the acquisition of financial rights creates a situation in which the attorney may well be forced to choose between his own pocketbook and the interests of his client. Vigorous advocacy of the client's interest may reduce the value of publication rights; conversely, ineffective advocacy may result in greater publicity and greater sales. In fact, it has been held that the acquisition of such book rights by a defendant's attorney constitutes a conflict of interest which may so prejudice the defendant as to mandate the reversal of a conviction. (See *People v. Corona* (1978), 80 Cal. App. 3d 684, 145 Cal. Rptr. 894.) In *Corona* the defendant retained a private attorney who, in exchange for his services, obtained exclusive rights to the defendant's life story and a waiver of the attorney-client privilege. The income derived from publication was to go solely to the attorney. The court in *Corona* held that reversal was warranted because the attorney deliberately decided not to develop viable incompetence, insanity and irresponsibility defenses so as to insure that the publication rights would retain their value. The defendant thus suffered actual prejudice from the conflict.

Under our precedents such a showing would not be necessary, because we have held that the acquisition by an attorney of a financial stake in litigation directly adverse to that of his client is a *per se* conflict, which warrants reversal even in the absence of prejudice. (See, e.g., *People v. Washington* (1984), 101 Ill. 2d 104; *People v. Coslet* (1977), 67 Ill. 2d 127; *People v. Stoval* (1968), 40 Ill. 2d 109.) In such cases, defense counsel's "tie to a person or entity *** which would benefit from an unfavorable verdict for the defendant *** might 'subliminally' affect counsel's performance in ways difficult to detect and demonstrate." Moreover, such a conflict might subject the attorney to later charges that his rep-

resentation was less than faithful. (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 16, 17.) However, the mere fact that the defendant's attorney was offered, and refused to accept, a contract for publication rights does not constitute a "tie" sufficient to engender a *per se* conflict. We could not therefore reverse on the basis of this alleged conflict without some showing of prejudice—*i.e.*, without a showing that the alleged conflict caused specific, identifiable deficiencies in defense counsel's performance. The allegation that defense counsel kept careful records of his transactions with the defendant proves nothing—careful records would be valuable for many legitimate purposes relevant to the conduct of the defendant's case. The general allegation that defense counsel neglected the defendant's case in favor of keeping records for a later book sale is, without more, meaningless. Because the defendant has not pointed to specific actions not taken because of too much attention to careful record-keeping, he has not sufficiently alleged prejudice.

In a related series of contentions, the defendant now claims that, after a dispute with his attorney over the proper conduct of his defense, he requested a different attorney but was thwarted from obtaining one by his attorney's alleged machinations. More specifically he claims that his attorney "blocked this by not letting me talk with, call or write anyone, unless it was censored by [defense counsel]" (No. 4), that his attorney failed to secure a well-known, out-of-State, defense attorney as the defendant's counsel (No. 5), and that he obtained by subterfuge the defendant's signature on a motion to have counsel appointed for him (No. 22).

To believe these contentions we would have to believe that during a lengthy period leading up to, during, and following the defendant's trial, his counsel single-handedly kept the defendant incommunicado. This is preposterous. Nothing prevented the defendant from writ-

ing to F. Lee Bailey, his relatives, or, for that matter, the trial judge and expressing his desire for another attorney. The defendant is not illiterate and is perfectly capable of understanding a motion for appointment of counsel by the court.

Allied to these claims are a number of others which relate to supposed disagreements between the defendant and his attorney over the proper course of his defense. Thus the defendant claims that he did not want to agree to joinder of all the charges against him (Nos. 6, 27) and was inadequately advised and misled as to the consequences of raising the affirmative defense of insanity (No. 21). If these are claims that the defendant has a right to micro-manage all aspects of his defense, they must fail because no such right exists. If they are claims that his attorney was incompetent for failing to object to joinder or for raising the defense of insanity, they are frivolous. The defendant has not given any legal argument, and we know of none, for the proposition that the counts should have been severed and the State forced to conduct separate trials on each of 33 charges of murder. Therefore, under *Strickland*, the defendant has not demonstrated a reasonable probability that the outcome would have been different. The defendant is also not correct in his statement that a plea of insanity constitutes an "admission of guilt on all counts."

The defendant also claims that his attorney was incompetent because he lacked experience in "mass-murder" cases and because the attorney's son was in the hospital at the time of the defendant's arrest (No. 1). Both of the claims are meritless. In *United States v. Cronic* (1984), 466 U.S. 648, 665, 80 L. Ed. 2d 657, 672, 104 S. Ct. 2039, 2050, the United States Supreme Court specifically rejected the use of "inexperience" as a *per se* indicium of incompetence: "The character of a particular lawyer's experience may shed light in an evaluation of

his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation." The notion that a lawyer would need a special "mass-murder" expertise in order competently to represent the defendant is therefore without merit. The defendant has also not identified any particular action taken or not taken by his attorney as a result of the illness of the attorney's son.

Many of the defendant's claims of incompetence also relate to the defendant's supposed desire not to plead insanity but, rather, to plead not guilty to all the charges and prove a defense of alibi. The defendant claims that his attorney failed to: investigate a possible alibi defense (No. 10) or "potential defense of Not Guilty" (No. 23), subpoena employment records which would have demonstrated such a defense (No. 13), investigate unstated "evidence establishing innocence, or conspiracy" (No. 12), "challenge and attack the case in chief" and make objections to the admission of unspecified evidence (No. 24). He also claims that his attorney was ineffective because he kept replacing unnamed "investigators because they kept finding evidence showing others may have committed the crime, because it didn't fit into the Insanity defense" (No. 14).

All of these claims of incompetence must fail, for two reasons. First, under *Strickland*, an attorney's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland*, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.) In this case, the attorney's decision not to investigate supposed evidence of alibi but to rely instead on the insanity defense was not unreasonable. We will not rehash the over-

whelming evidence—including the 29 bodies recovered from the crawlspace under the defendant's home and the defendant's detailed confessions—which proved that the defendant had committed the acts with which he was charged. (103 Ill. 2d at 45-50.) But given this evidence, it was not unreasonable for the defendant's attorney to choose an insanity defense, and to forgo vain attempts to prove that the victims were killed by some other person. The different factual context distinguishes this case from *United States ex rel. Green v. Rundle* (3d Cir. 1970), 434 F.2d 1112, cited by the defendant, in which alibi was the only plausible defense. Indeed, had the defendant's attorney taken the opposite tack, and neglected the insanity defense in favor of futile attacks on the State's case in chief, the defendant would now have a much more plausible claim of incompetence. The same reasoning, together with the absence of factual detail in the defendant's claims, militates against a finding of a reasonable probability of a different outcome had the defendant's attorney taken the actions which the defendant now wishes that he had taken.

Similar reasoning dictates rejection of claims that the defendant's trial attorney made a number of other errors, including: "failing to interview state witness prior to taking the stand" (No. 7), "failure to interview or call [character] witnesses" at trial (No. 11), failing to object to the prosecution's use of large "billboard" exhibits (No. 16), failure to object to the "limited" *voir dire* of the jury (No. 17), and failure to "bring" perjury charges against three unnamed prosecution witnesses (No. 43) or to raise the "issue" of perjury (No. 43—A). In all of these cases, the defendant's claims are either so unspecific as to be unintelligible or relate to such minor issues that they cannot support a finding of a reasonable probability of a different outcome.

A number of other claims of incompetence were actually raised by the defendant's attorney on this appeal and do not need to be separately considered. These include claims that the defendant's attorney lacked "tactical or strategic justification for his conduct at the sentencing hearing" (No. 19), failed to raise extreme emotional disturbance as a mitigating factor (No. 20), failed to present evidence at the hearing and gave a casual or perfunctory closing statement (No. 25), and failed to request that the jury be sequestered sooner (No. 30). The only novel aspect to the defendant's charges of incompetence at the sentencing hearing is that he specifically mentions defense counsel's failure to use the defendant's "drug problem" in his closing argument at trial or at the sentencing hearing (No. 39). As we have stated with regard to other mitigating evidence, the defendant's use of drugs was brought to the jury's attention during trial, and was introduced at the sentencing hearing by stipulation. We cannot say to a reasonable probability that more emphasis upon this circumstance by defense counsel would have changed the outcome of the hearing or trial.

Several other of the defendant's claims against his attorney concern matters which, whether or not they are true, have no bearing upon defendant's case. For the purposes of this appeal, it does not matter whether it is true, as the defendant claims, that a valuable television set mysteriously disappeared from the defendant's attorney's office (No. 28). This is not relevant here. Similarly, an unsupported allegation that defense counsel "leaked" confidential information (No. 29) is meaningless without a statement of what information was disclosed and how it damaged the defendant.

A final set of claims of incompetence relate to his attorney's supposed lack of vigor in attempting to exclude or suppress various pieces of evidence. The defendant

argues, for example, that his attorney failed to "challenge weaknesses in the prosecution's search warrants" (No. 2), failed to challenge the admission of defendant's statements even though the defendant was supposedly the victim of the " 'Christian Burial ploy' " (the defendant is apparently referring to the interrogation technique which consists of asking a murder suspect to provide the location of a missing body so that it can receive a "Christian burial" (see, *e.g.*, *Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232)) and was denied access to his attorney (No. 9), failed to "void" the defendant's supposedly illegal arrest (No. 18), and failed to challenge the accuracy of the inventory of items seized in the search of defendant's home (Nos. 41, 42). In connection with these claims, the defendant also re-raises his substantive challenges to the validity of the search warrants (Nos. 35, 36). In most of these instances, defendant's claims must fail for the simple reason that challenges to the admission of these items of evidence would have failed, and, in some cases, did fail—not because of any lack of vigorous advocacy but because of lack of legal merit. In our opinion on direct appeal, we have already stated why the search warrants used in the case were valid and that they identified the items to be seized with sufficient particularity. (103 Ill. 2d at 24-28.) We have also stated why the defendant's confessions were properly admitted and why we do not believe that he invoked his right to counsel before being interrogated. (103 Ill. 2d at 28-29.) Absent an allegation that the defendant was not given his *Miranda* warnings, the police were entitled to use "the Christian burial ploy" as a means of interrogation. The claim that the police had no probable cause to arrest the defendant after finding 29 bodies in the crawlspace under his house is frivolous. The defendant's claim that his insanity defense would have benefited from a more accurate inventory of

the drugs found at his house during the search is, to say the least, bizarre. We have already stated why more or better evidence of the defendant's drug-taking was not likely to change the outcome of his trial. The argument that his counsel was incompetent for failing to object to an instruction telling the jury not to consider "sympathy" in their deliberations must also fail because, as is now clear, the instruction was proper. *People v. Spreitzer* (1988), 123 Ill. 2d 1, 41-43.

Some other claims raise substantive issues which were either considered on direct appeal or lack merit. Those which were rejected on direct appeal include claims of prosecutorial misconduct on summation (Nos. 32, 40) (see 103 Ill. 2d at 96-98), and the prejudicial effect of inflammatory and irrelevant comments of a witness (No. 34) (see 103 Ill. 2d at 74-75). We see no need for reconsideration, and the defendant has presented no more cogent arguments in support of his contentions than he did on his direct appeal. The claim that the defendant, who is white, was prejudiced by the alleged exclusion of black veniremen from his jury (No. 38) has no merit. (See *People v. Holland* (1987), 121 Ill. 2d 136, 157.) The defendant's point which is labeled "No. 41" contains only a list of constitutional provisions which is intended to support other points. There is no point numbered "33."

It remains only to consider those points numbered 8, 15, and 31. These claim, in essence, that the defendant was denied his right against coerced self-incrimination by the admission of statements he made to the State's examining psychiatrists, statements which were garnered without first providing him with *Miranda* warnings. These claims, and the ancillary claim of incompetence which is made in connection with them, are meritless. It is true that, under *Estelle v. Smith* (1981), 451 U.S. 454, 468, 68 L. Ed. 2d 359, 372, 101 S. Ct.

1866, 1876, "[a] criminal defendant, *who neither initiates a psychiatric evaluation nor attempts to introduce psychiatric evidence*, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." (Emphasis added.) Where, however, the defendant does attempt to introduce such evidence, *Smith* is inapplicable. (*Buchanan v. Kentucky* (1987), 483 U.S. 402, 424, 97 L. Ed. 2d 336, 356, 107 S. Ct. 2906, 2918.) Here, the defendant's entire defense strategy was premised upon a plea and proof that the defendant was not guilty by reason of insanity. Therefore, this claim is without merit.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk is directed to enter an order setting Wednesday, the 11th day of January, 1989, as the date on which the sentence of death entered by the circuit court of Cook County shall be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections, to the warden at Stateville Correctional Center, and to the warden of the institution where the defendant is confined.

*Affirmed.*