The appellant was convicted of the murder, made capital because it was committed during a kidnapping, of 13-year-old Lisa Ann Millican. The trial court sentenced the appellant to death, overriding the jury's recommendation of life imprisonment without parole. On direct appeal, the appellant's conviction and sentence of death were affirmed by this court and this court's judgment was affirmed by the Alabama Supreme Court. The United States Supreme Court denied the appellant's petition for a writ of certiorari. Neelley v. State,494 So.2d 669 (Ala.Cr.App. 1985), affirmed, 494 So.2d 697 (Ala. 1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702
(1987). The appellant filed her first post-conviction petition, pursuant to Rule 20, A.R.Cr.P.Temp., on May 18, 1987. An evidentiary hearing on the petition was conducted, following which the trial court denied the petition. This denial was affirmed by this court, without opinion and the Alabama Supreme Court denied certiorari review, as did the United States Supreme Court. The present petition was filed on October 12, 1989, pursuant to Rule 20, A.R.Cr.P.Temp., and the appellant amended that petition on November 27, 1989. The State responded on December 8, 1989, and, on February 22, 1990, the trial court dismissed a majority of the claims and ordered an evidentiary hearing on the claims alleging that counsel was ineffective and that the appellant had not been competent to stand trial. This hearing was held in January 1991 and on August 8, 1991, the appellant filed a motion to again amend the petition, which motion the trial court denied on February 27, 1992. On that same date, the trial court filed an order denying the appellant relief of all claims asserted in the petition as originally amended.
 I
The appellant argues that the issues that she raised and that were dismissed by the trial court on procedural grounds, should have been discussed on the merits, pursuant to Rule 45A, A.R.App.P. However, it is well settled that the plain error rule applies only on direct appeal and not in collateral review proceedings. Ex parte Clisby, 501 So.2d 483, 484 (Ala. 1986);Thompson v. State, 581 So.2d 1216, 1218-19 (Ala.Cr.App. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 868, 116 L.Ed.2d 774
(1992); Duren v. State, 590 So.2d 360, 368-69
(Ala.Cr.App. 1990), affirmed, 590 So.2d 369 (Ala. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992);Wright v. State, 593 So.2d 111, 119 (Ala.Cr.App. 1991), cert. denied, ___ U.S. ___, 113 S.Ct. 132, 121 L.Ed.2d 86 (1992);Bell v. State, 593 So.2d 123, 126 (Ala.Cr.App. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 2981, 119 L.Ed.2d 599 (1992). Therefore, we find no error in the trial court's refusal to review these claims.
 II
The appellant argues that the trial court abused its discretion in denying her *Page 497 
second motion to amend her petition. In that amendment to her petition, the appellant alleged racial discrimination in the selection of jurors, an improper jury instruction on reasonable doubt, and the unconstitutionality of the Alabama statute concerning compensation of attorneys in capital cases, §15-12-21, Code of Alabama. These latter two issues are addressed by the appellant on this appeal. The trial court denied the appellant's motion to amend on the grounds that the amendment "comes after the evidentiary hearing was completed in the case and is not based upon surprise, newly discovered evidence or changed circumstances."
 "Rule 20.7(b) of the Alabama Temporary Rules of Criminal Procedure [now Rule 32.7(b), Alabama Rules of Criminal Procedure] reads as follows: 'Amendments to pleadings may be permitted at any stage of the proceedings prior to the entry of judgment.' (Emphasis added [in Cochran].) The clear import of the language used in Rule 20.7(b) [Rule 32.7(b)] is that a petitioner does not have an absolute right to amend his petition prior to the entry of judgment.
 " 'Amendments are to be freely allowed when justice requires.' Ex parte Tidmore, 418 So.2d 866, 868 (Ala. 1982). '[A]mendments should be freely allowed and . . . trial judges must be given discretion to allow or refuse amendments. . . . The trial judge should allow a proposed amendment if it is necessary for a full determination on the merits and if it does not unduly prejudice the opposing party or unduly delay the trial.' Record Data International, Inc. v. Nichols, 381 So.2d 1, 5
(Ala. 1979) (citations omitted). 'The grant or denial of leave to amend is a matter within the sound discretion of the trial judge and is subject to reversal on appeal only for an abuse of that discretion. Walker v. Traughber, 351 So.2d 917
(Ala.Civ.App. 1977). The trial court acts within its discretion so long as its disallowance of an amendment of pleadings is based upon some valid ground, such as an actual prejudice or undue delay. Poston v. Gaddis, 372 So.2d 1099 (Ala. 1979).' Ex parte Reynolds, 436 So.2d 873, 874 (Ala. 1983). Although the cases cited in this paragraph deal with the interpretation of Rule 15, A.R.C.P. [Temp.], the principles expressed have equal application here."
Cochran v. State, 548 So.2d 1062, 1075 (Ala.Cr.App. 1989). InCochran, defendant attempted to amend his petition eight months after it had originally been filed, after the evidentiary hearing had begun, after the circuit court had ruled on a related ground asserted in his petition, and after having previously filed a motion to amend. This court held:
 "Cochran cannot claim that his proposed amendment was based on surprise, newly discovered evidence, or changed circumstances. 'Courts may properly refuse permission to amend . . . where there is no showing of diligence or that the facts were unknown to the applicant prior to his application.' 61 Am.Jur.2d, § 312 at 301 (1981). See also Robinson v. Kierce, 513 So.2d 1005, 1006-07 (Ala. 1987); National Distillers and Chemical Corp. v. American Laubscher Corp., 338 So.2d 1269, 1273-75 (Ala. 1976)."
Id. See also Whitehead v. State, 593 So.2d 126
(Ala.Cr.App. 1991). In this case, where the appellant failed to file the motion for leave to amend until seven months after the evidentiary hearing had been held and because the claims asserted in that amendment were not based on surprise, newly discovered evidence, or changed circumstance, we find no abuse of discretion by the trial court. The appellant attempts to raise in her brief to this court the same claims that were included in the second amendment; these claims are procedurally barred. Rules 20.2(a)(3), 20.2(a)(5), 20.2(b), A.R.Cr.P.Temp.
 III
The appellant argues that one of the attorneys who represented her at trial and on appeal engaged in unprofessional, unethical, and immoral conduct, which she says, indicated a complete lack of judgment and rationality, and resulted in ineffective assistance of counsel. The appellant cites the attorney's unconventional beliefs, questionable emotional stability, and offering her illegal drugs on several occasions. *Page 498 
In his order, the trial judge addressed this claim as follows:
 "In support of this allegation petitioner cites counsel's testimony that he is a mystic, that he is clairvoyant and a prophet, that he hears voices and responds to them, and that he possesses the paranormal power to 'sparkle' and to send 'blue beams of energy.'
 "It is not unfair to characterize trial counsel's behavior cited above as eccentric and unorthodox. There has been no showing and there is no evidence, however, that this behavior interfered with or adversely affected counsel's representation of petitioner, and without a nexus between such beliefs and practices to his trial preparation or performance, they provide no basis for finding that his performance was deficient or his assistance ineffective.
 "Petitioner also alleges that counsel provided her with illegal drugs on several occasions. The only evidence to support this allegation is testimony of the petitioner. Counsel denies the allegation and testified that he was strip-searched every time that he went to visit petitioner at the penitentiary. The court finds that counsel did not provide petitioner with drugs."
The attorney testified that he did have spiritual views that may seem unusual, but that he did not believe that his views hindered, or in any way affected, his representation of the appellant. He testified that he took no action and based no decisions at trial on his belief in paranormal experiences. Moreover, the appellant has presented no evidence to support her allegation that her attorney's performance was affected in any way by his beliefs.
As to the appellant's allegation that her attorney provided her with illegal drugs, he denied this allegation and testified that he was searched by prison officials prior to each visit with the appellant.
 "The trial court, when deciding this issue, faced a credibility question. . . . We accord the trial court's ruling deference. The trial court was in a better position than this court to rule on this question because the trial judge was able to observe the demeanor of the witness."
Hallford v. State, 629 So.2d 6 (Ala.Cr.App. 1992). See alsoSpinks v. State, 564 So.2d 1043, 1046 (Ala.Cr.App. 1990); Statev. Terry, 601 So.2d 161 (Ala.Cr.App. 1992).
 "In giving meaning to the [constitutional requirement of effective assistance of counsel] . . . we must take its purpose — to ensure a fair trial — as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.
". . . .
 "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."
Strickland v. Washington, 466 U.S. 668, 686-87, 104 S.Ct. 2052,2064, 80 L.Ed.2d 674 (1984).
Based on the record in this case, the trial court properly found that the performance of the appellant's attorney was not deficient. Because we conclude that the attorney's performance was not deficient, we need not address the Strickland
component, i.e., whether the attorney's defective performance prejudiced the defense. Cf. State v. Roland, 808 S.W.2d 855
(Mo.App. 1991) (court found attorney who allegedly took drugs while representing the defendant and acted erratically during trial did not render ineffective assistance.) *Page 499 
 IV
The appellant argues that she received ineffective assistance of counsel, because her attorney sexually abused and sexually harassed her, and, she says, this alleged abuse and harassment inhibited her from fully cooperating and communicating with him.
During the hearing held on this petition, the appellant presented the testimony of an expert in domestic and interpersonal violence. The expert testified that she had met with the appellant and that she was basing her opinion on information supplied to her solely by the appellant. She stated that the appellant had told her that her attorney had made lewd and sexual remarks at every meeting they had had prior to trial. The appellant further told her that he had kissed, hugged, and "nibbled" her. The expert further testified that she had seen letters that the attorney had written to the appellant containing sexual comments, innuendo, and drawings, but she acknowledged that none of these letters were written until after trial. The expert testified that the appellant told her that this activity made her distrust her attorney. It was her opinion that these actions constituted sexual harassment, and that they thereby promoted the appellant's dependency on her attorney, and diminished her ability to cooperate with him in her defense. On cross-examination, the expert acknowledged that the appellant had also made sexual references and statements in her correspondence with her attorney.
During the hearing, the attorney testified that, other than questions of a sexual nature pertaining to the facts of the case and to the past sexual abuse of the appellant by her husband, he had made no sexual remarks to the appellant until after the trial. He testified that he began to write the appellant letters containing sexual innuendo to "keep her spirits up," but that they were merely "jailhouse" games with "jailhouse talk." Her attorney testified that he considered the letters and sexual references to be jokes, and believed that the appellant had also construed them as such. He said that the appellant had never indicated that she found any statements or letters offensive or inappropriate, and that, if she had so indicated, he would have immediately stopped.
In its order, the trial court found as follows concerning the appellant's claim that her attorney's sexual harassment prevented her from receiving effective assistance of counsel:
 "The evidence establishes and the court finds that trial counsel permitted a relationship to develop between himself and petitioner which exceeded that of an appropriate attorney-client relationship. The relationship was such that sexual innuendos and sexually explicit remarks became common incidents of communication between them. This conduct demonstrated a serious departure from the professionalism expected of attorneys.
 "Petitioner has not shown, however, that such behavior prejudiced the conduct of her trial. The only evidence touching this issue is that of Dr. Lenore Walker [the expert witness] who expressed the belief that the relationship 'fostered dependency' by petitioner upon counsel and inhibited her from fully cooperating and communicating with counsel.
 "The impact, if any, of the relationship on the trial is, at best, speculative and the court finds that petitioner has failed to carry the burden of showing that counsel's sexual expressions resulted in actual prejudice to her defense."
While her attorney's actions may have constituted sexual harassment, as alleged, and may constitute a sound basis for other causes of action, see, e.g., McDaniel v. Gile, 230 Cal.App.3d 363,281 Cal.Rptr. 242 (Cal.App. 2 Dist. 1991) (attorney's sexual harassment of client formed the basis for a suit alleging legal malpractice and the intentional infliction of emotional distress); and Otis's Case, 135 N.H. 612,609 A.2d 1199 (1992) (attorney's sexual harassment of client warranted disbarment), the record does not indicate that these actions and statements by the appellant's attorney resulted in his providing ineffective assistance of counsel under Strickland v.Washington, supra.
"The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to *Page 500 
justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." Strickland v. Washington,466 U.S. 668, 691-92, 104 S.Ct. 2052, 2066-67, 80 L.Ed.2d 674 (1984). The appellant has clearly failed to establish the prejudice prong of the two-pronged test established in Strickland v.Washington, supra.
 "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 "In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like. . . . The assessment of prejudice should proceed on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision. . . .
 ". . . When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When the defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
 "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."
Strickland v. Washington, 466 U.S. at 694-95,104 S.Ct. at 2068-69.
The appellant has failed to argue how this admittedly inappropriate behavior by her attorney specifically affected his performance or the outcome of her trial, and there has been no showing that, but for this conduct by him, the result of her trial would have been different. Moreover, during the hearing on the Rule 20 petition, the appellant testified that during the course of her trial and until shortly thereafter she was in love with her attorney.
 V
The appellant argues that she was denied effective assistance of counsel because one of her attorneys at trial and on appeal labored under a conflict of interest that adversely affected his performance. The appellant refers to a publicity contract between her and the attorney, which, she alleges, motivated his desire to sensationalize the trial. Specifically, the appellant argues that this conflict of interest adversely affected her attorney's performance in the following ways: He failed to move for a change of venue; he failed to consult with her about the possibility of a negotiated plea for life imprisonment without parole; he failed to conduct an adequate pretrial investigation of the "battered woman syndrome" as a viable defense; he failed to adequately examine veniremembers or to seek individual voir dire of "particular jurors"; he introduced certain evidence and testimony for the sole purpose of sensationalizing the trial; he failed to object to certain evidence, specifically photographs of the victim, her statement, and the testimony of her case worker and other victims; he elicited too much testimony from her during trial; he failed to present any witnesses, other than the appellant, during the sentencing phase of the trial; he made inflammatory and sensational statements to the press; and he refused to "relinquish control" of her case.
The record indicates that the publicity contract referred to by the appellant was not executed until June 24, 1983, three months after the trial and after the filing of the motion for new trial. Under the contract, her attorney would receive one-half of any *Page 501 
profits from any publicity, and the appellant "or her nominees" would receive one-half of the "net profits" from any "commercialization" of the offense or the trial. The contract does contain the provision that " '[n]et profits' is a term to be defined by [her attorney] as he deems necessary." There was also a provision that, should the appellant die before any profits are realized, her children would be entitled to her portion. Her attorney testified that the contract was intended to provide financial support for the appellant's children and to protect the appellant from continued media harassment. Her attorney admitted that years after the appellant's trial, he negotiated with various media representatives, but that no agreement was ever reached. He further testified that until 1989 he was unaware that a contract giving a lawyer literacy on media rights violates the Alabama Rules of Professional Conduct, governing the ethical conduct of lawyers. See Rule 1.8(d), Alabama Rules of Professional Conduct; such conduct was prohibited by DR 5-104(b), Alabama Code of Professional Responsibility.
The trial court found that the publicity contract created an actual conflict of interest; however, it found that the conflict of interest did not adversely affect the attorney's performance. The trial court based its determination that an actual conflict of interest arose on DR 5-104(b), Alabama Code of Professional Responsibility (now Rule 1.8(d), Alabama Rules of Professional Conduct), and certain case law, specificallyUnited States v. Hearst, 638 F.2d 1190 (9th Cir. 1980), cert. denied, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981);People v. Gacy, 125 Ill.2d 117, 125 Ill.Dec. 770,530 N.E.2d 1340 (1988), cert. denied, 490 U.S. 1085, 109 S.Ct. 2111,104 L.Ed.2d 671 (1989); People v. Corona, 80 Cal.App.3d 684,145 Cal.Rptr. 894 (1978).
 "In most ineffective assistance cases, the defendant has the burden of affirmatively proving prejudice. Where, however, an alleged conflict of interest predicates the ineffectiveness claim the defendant bears a lighter burden. That is, where a defendant puts a trial judge on notice of the alleged conflict before or during trial and the trial court fails to inquire into the conflict, a reviewing court will presume prejudice upon a showing of possible prejudice; Holloway v. Arkansas, 435 U.S. 475, 484-91, 98 S.Ct. 1173, 1178-82, 55 L.Ed.2d 426 (1978); Cuyler v. Sullivan, 446 U.S. 335, 345, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980); on the other hand, if the defendant fails to put the trial court on notice of the alleged conflict, a reviewing court will presume prejudice upon a showing that the potential conflict developed into an actual conflict which adversely affected the defense lawyer's performance. Id. at 348-50, 100 S.Ct. at 1718."
United States v. Marrera, 768 F.2d 201, 205-06 (7th Cir. 1985), cert. denied, 475 U.S. 1020, 106 S.Ct. 1209, 89 L.Ed.2d 321
(1986). In this case, the appellant failed to place the trial court on notice of this alleged conflict of interest at any time during the trial or while her appeal was pending.
 "In a conflict of interest situation, the court will presume prejudice to the defendant if he shows that he received inadequate representation because counsel actively represented conflicting interests. Cuyler v. Sullivan, 446 U.S. 335, 349-50, 100 S.Ct. 1708, 1718-19, 64 L.Ed.2d 333
(1980); Porter v. Wainwright, 805 F.2d 930, 939
(11th Cir. 1986); cert. denied, [482] U.S. [918], [919], 107 S.Ct. 3195, 3196, 96 L.Ed.2d 682 [683] (1987). A potential conflict is not sufficient to impugn a criminal conviction, Cuyler, 446 U.S. at 350, 100 S.Ct. at 1719, but the standard developed in Cuyler has been applied to cases in which defendants argue that their lawyers were more interested in publicity than in obtaining an acquittal. See United States v. Hearst, 638 F.2d 1190 (9th Cir. 1980), cert. denied, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981)."
Zamora v. Dugger, 834 F.2d 956, 960-61 (11th Cir. 1987). The Eleventh Circuit Court of Appeals, in Zamora v. Dugger, noted that although a potential conflict of interest is insufficient to impugn a criminal conviction in certain cases defendants have argued that, because their attorneys were more interested in generating publicity than in representing their clients effectively, they should be acquitted or awarded a new trial. The court *Page 502 
cited United States v. Hearst, which the trial court in this case also cited. However, in Zamora v. Dugger, the court distinguished the facts of United States v. Hearst from those of Zamora, stating:
 "In Hearst, F. Lee Bailey was held to have a conflict of interest because he had contracted with a publisher during the course of the proceedings to write a book about his client, Patty Hearst, and her case. 638 F.2d at 1192. Like Bailey, Ellis Rubin [the attorney in Zamora v. Dugger], contracted to write a book about his client's trial. However, Rubin did not negotiate for the book contract during the course of the proceedings. Rubin conducted negotiations one year after trial.
 "In addition, Zamora did not testify at trial, unlike Patty Hearst. Thus, Rubin is not susceptible to the allegation raised against Bailey that he had his client testify so that he could write about it in his book. Consequently, the book contract in this case did not constitute a conflict at the time of trial."
Zamora v. Dugger, 834 F.2d at 961 f.n. 4. Similarly, in this case, the appellant's attorney did not execute the publicity contract during the course of the trial, but rather after the appellant's trial, and did not engage in negotiations with media representatives until years after the trial. While the appellant did testify at trial, the record is clear that she chose to do so, and she has not claimed that her testifying was orchestrated by her attorney to sensationalize the case. Indeed, her attorney's publicity rights would have been more valuable had she been acquitted. As the Court noted in Zamora, "even if it had been established that [the attorney] was interested in publicity, his reputation would have been 'more enhanced by a successful defense of so serious a case rather than by its loss.' " Zamora v. Dugger, 834 F.2d at 961. See also United States v. Hearst, 638 F.2d at 1193 ("[t]his alleged conflict was not total, for surely the salability of Bailey's book would have been enhanced had he gained an acquittal for Hearst").
In United States v. Marrera, supra, the court found that an attorney's fee arrangement with his client, awarding the attorney any proceeds from the sale of movie rights to the defendant's participation in the offense and subsequent events created a potential conflict of interest that never developed into an actual conflict. In so ruling, the court emphasized that the defendant was aware of his lawyer's financial interest in the movie rights and that, by willingly taking a trip to Hollywood to sell his story, the defendant was jeopardizing his own defense. Thus, the court concluded that the defendant shared the blame with his lawyer. The court emphasized the ethical obligations of defense counsel, as follows:
 "In Cuyler the Supreme Court noted that '[d]efense counsel had an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of the trial. . . . [T]rial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel.' 446 U.S. at 346-47, 100 S.Ct. at 1716 (footnote omitted). The Cuyler court went on to explain that the defense counsel ' " 'is in the best position professionally and ethically to determine when conflict of interest exists or will probably develop in the course of a trial.' " ' Id. at 347, 100 S.Ct. at 1717 (quoting Holloway v. Arkansas, 435 U.S. at 485, 98 S.Ct. at 1179 and State v. Davis, 110 Ariz. 29, 31, 514 P.2d 1025 (1973)); see also United States ex rel. Ballard v. Bengston, 702 F.2d 656, 662 n. 6 (7th Cir. 1983) (defense attorneys have the primary responsibility for the ascertainment and avoidance of conflicts of interest); United States v. Medina-Herrera, 606 F.2d 770, 776 (7th Cir. 1979) (the same effect) cert. denied, 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980)."
768 F.2d at 206. However, in describing defense counsel's ethical obligations and acknowledging that the attorney in that case had apparently breached this ethical obligation, the court noted that a defendant's criminal appeal was "not a proceeding to discipline counsel," and stated that "[e]ven if it were, we would not discipline counsel by freeing his client."Id. at 208.
The court distinguished the facts of Marrera from those ofUnited States v. Hearst, *Page 503 
stating "In Hearst, the defendant, Patty Hearst, did not, unlike Marrera, share any financial interest with her attorney in the hoped-for proceeds from the sale of the story behind the crime." Id. at 207 f.n. 7. Like the defendant in Marrera, the appellant in this case, was to share in any profits with her attorney.
In United States v. Hearst, the court remanded the case for the lower court to apply "the law recently laid down by the Supreme Court in Cuyler v. Sullivan, 446 U.S. 335,100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)." 638 F.2d at 1193. The court further noted that a hearing was necessary because certain of Hearst's allegations were based on evidence not appearing on the record. Id. at 1195. While the court stated "Bailey's potential conflict of interest is virtually admitted, and Hearst has alleged an actual conflict and adverse effect in sufficient and not implausible detail," Id. at 1195, the court held that "Bailey's book contract created a potential conflict of interest; [and] this case tests whether it ripened into an actual conflict of interest." Thus the court did not hold that the contract created an actual conflict of interest, but rather remanded the case for that determination to be made by the trial court.
Similarly, defendants in state courts have asked the courts to adopt a rule that a per se conflict of interest exists where there is an agreement between defense counsel and the defendant giving to defense counsel publication or literary rights in the case. In the vast majority of these cases, the courts have refused to do so. Dumond v. State, 294 Ark. 379,743 S.W.2d 779, 785 (1988) ("[a] petitioner concedes, courts usually hold that there is no per se rule regarding such contracts.Wojtowicz v. United States, 550 F.2d 786 (2d Cir.), cert.denied, 431 U.S. 972, 97 S.Ct. 2938, 53 L.Ed.2d 1071 (1977);Ray v. Rose, 535 F.2d 966 (6th Cir.), cert. denied,429 U.S. 1026, 97 S.Ct. 648, 50 L.Ed.2d 629 (1976).") Thus, in Staffordv. State, 669 P.2d 285 (Okla.Cr. 1983), vacated, 467 U.S. 1212,104 S.Ct. 2652, 81 L.Ed.2d 359 (1984), on remand, 697 P.2d 165
(Okla.Cr. 1985), the Oklahoma Court of Appeals addressed this issue, stating:
 "This issue presents a matter of great ethical and judicial concern. The American Bar Association Code of Professional Responsibility specifically prohibits counsel from acquiring an interest in publication rights concerning the matter for which he is employed prior to conclusion of that matter. It is, however, for the Bar to determine the necessity of any disciplinary action pursuant to DR 5-104(B). Our concern in the matter lies in ensuring the appellant's sixth amendment right to adequate representation was protected.
 "To afford relief to the appellant upon these grounds, it must be established that an actual, not a possible, conflict of interest existed. Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Further it must be established that the actual conflict of interest adversely affected the attorney's performance. Cuyler v. Sullivan, supra."
Stafford v. State, 669 P.2d 285, 296-97. (Emphasis in original.) The United States Supreme Court vacated the Oklahoma Court of Appeals' original decision and remanded it for consideration in light of the Strickland v. Washington standard for measuring an attorney's effectiveness. Thus, using the standard set forth in Strickland, the Oklahoma Court of Appeals analyzed defense counsel's actions in allegedly contracting to defend his client in exchange for the exclusive publication rights of his client's life. In Stafford v. State,697 P.2d 165, 168, the court held:
 "The [defendant] contends that this per se caused assistance of counsel to be ineffective and that the burden to prove absence of prejudice shifted to the State. This is not so. Even as Strickland notes, if a conflict of interest exists, prejudice is presumed only when defendant proves his counsel actively represented conflicting interest and that an actual conflict adversely affected his attorney's performance. Strickland, 466 U.S. at 692-93, 104 S.Ct. at 2067, 80 L.Ed.2d at 696, citing Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Appellant has provided no authority for his assertion that the contract for publication rights per se made counsel's assistance ineffective. Compare United States v. Hearst, 638 F.2d 1190 *Page 504 
(9th Cir. 1980), cert. denied, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); Ray v. Rose, 535 F.2d 966 (6th Cir. 1976), cert. denied, 429 U.S. 1026, 97 S.Ct. 648, 50 L.Ed.2d 629; Fuller v. Israel, 421 F. Supp. 582 (E.D.Ill. 1976). Appellant has not offered any evidence which would entitle him to a new trial. . . .
 "The Supreme Court urged in Strickland that claims of ineffective assistance of counsel may be disposed of without reaching both components of the inquiry. A court, it reasoned, need not determine whether counsel's performance was deficient if it determined there was an insufficient showing of prejudice. 'The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.' Strickland, 466 U.S. at 698, 104 S.Ct. at 2070, 80 L.Ed.2d at 699.
". . . .
 "We do not find that counsel's conduct was so poor as to have undermined the proper functioning of the adversarial process and to have produced an unreliable result. The Supreme Court noted in Strickland that the testing procedure they set forth would yield different results in only the rarest instances. 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. We find it does not change the result of the present case and that appellant has failed to demonstrate that minus counsel's contract, a different result would have been reached, especially in light of the utterly overwhelming evidence of his guilt."
Furthermore, the Oklahoma Court of Appeals distinguished the facts of Stafford v. State, supra, from those of People v.Corona, supra, which the trial court in the present case, relied on. The Oklahoma Court of Appeals did so by noting that the publication contract was available to the court in Corona and "counsel's actions in that case revealed the contract had definite adverse effects on his legal representation of Corona." Stafford v. State, supra, 669 P.2d at 297. In further distinguishing, the court stated of the attorney in People v.Corona, supra:
 "Counsel actively sought media coverage during the trial, which behavior prompted the trial court to verbally chastise him on at least two occasions (145 Cal.Rptr. at 918). In the appellate court's words, '. . . defense counsel engaged in continuous conduct to try the case in the press, regardless of the fact that the trial publicity was injurious to the interest of his client.' 145 Cal.Rptr. at 918).
 "Brewer's [Stafford's attorney's] conduct in the present case was clearly not as egregious as the conduct of Corona's attorney. Throughout the trial Brewer made objections, argued points of law, vigorously cross-examined witnesses and attempted to establish an alibi with witnesses for the defense. Although he agreed to the presence of television cameras in the courtroom during the trial, he did not attempt to try the case to the press."
Stafford v. State, 669 P.2d at 298.
Similarly, in this case, it is clear from the record that the appellant's attorney zealously and wholeheartedly represented the interests of the appellant, and earnestly participated in all aspects of the proceeding.
We conclude that the trial court erred in finding that an actual conflict of interest existed in this case, based on the publicity contract. Furthermore, while a potential conflict of interest existed because of the contract, in the present case it never ripened into an actual conflict.
Although the appellant has raised specific allegations of ineffectiveness based on this potential conflict of interest, because we have concluded that the appellant failed to establish an actual conflict of interest, the inquiry stops.Cuyler v. Sullivan, 446 U.S. at 349-50, 100 S.Ct. at 1719.
 "[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. See Holloway [v. Arkansas, 435 U.S. 475, 487-91, 98 S.Ct. 1173, 1180-82, 55 L.Ed.2d 426 (1978)]. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective *Page 505 
assistance. See Glasser [v. United States, 315 U.S. 60, 72-75, 62 S.Ct. 457, 466-67, 86 L.Ed. 680
(1942)].
 ". . . We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."
Id. See also Dumond v. State, 294 Ark. 379, 743 S.W.2d 779
(1988). In Dumond v. State, the court stated:
 "While recognizing the potential for a conflict of interest to develop in such cases and noting the language of Arkansas Rules of Professional Conduct, Rule 1.8(d), we will not presume prejudice. A petitioner who collaterally attacks his conviction under Rule 37 is required to show that he suffered some actual prejudice arising from a specific error by counsel. 'Prejudice is presumed only if the defendant demonstrates the counsel "actively represented conflicting interest" and that "an actual conflict of interest adversely affected his lawyer's performance." ' Strickland v. Washington, supra, citing Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). As with any claim of ineffective assistance of counsel, the petitioner has the burden of providing factual support to demonstrate that counsel actively represented conflicting interests and that the conflict of interest adversely affected the counsel's performance."
743 S.W.2d at 785. Therefore, we conclude that the defense counsel's performance was not ineffective because he entered into a publicity contract with the appellant.
 VI
The appellant argues that her trial counsel was ineffective for failing to prepare and present a defense based on the "battered woman syndrome." She argues that her trial attorneys failed to adequately investigate this defense or to retain any expert on this subject, and that, had they done so, the jury might have believed that she had lacked the requisite criminal intent. The appellant also argues that she should receive a new sentencing hearing because her counsel failed to present any evidence concerning the "battered woman syndrome" in mitigation during her sentencing hearing and, had that they done so the trial judge may not have imposed the death sentence.
However, the record indicates that the defense raised and pursued by the appellant's attorneys was based on the fact that the appellant had been abused by her husband and subjected by him to severe physical and psychological abuse. Although they did not use the term "battered woman syndrome," they nonetheless argued that, because of the abuse inflicted by her husband, Neelley lacked the criminal intent for the offense.
In its summary of the facts in this case on direct appeal, this court stated:
 "In his opening statement, defense counsel informed the jury of Mrs. Neelley's deprived childhood, of her mother's and her sister's promiscuity, and of how, at fifteen years of age, she ran away from home and married Alvin Neelley, a twenty-six-year-old 'ex-con' who stole her virginity and later her mind. Defense counsel told a story of how Mrs. Neelley was physically beaten and sexually abused; a story of how she was 'brainwashed,' and reduced to a 'vegetable' and an instrument and extension of her husband.
 "In his opening statement, defense counsel told the jury that Mrs. Neelley had been trained to do everything she could to try to keep Alvin satisfied and to avoid his beatings. Counsel related facts which involved Mrs. Neelley in robbery, firebombing, forgery, conspiracy to commit murder, and other crimes. Counsel told of how Alvin forced her to procure young girls with 'small sex organs' for him.
 ". . . Finally, defense counsel related how Mrs. Neelley, under Alvin's direction and control, injected [the victim] with [Drano] and [Liquid-Plumr], shot her in the back with a pistol, and pushed her body into Little River Canyon.
 ". . . Counsel stated that 'when the evidence is in the State will prove its case, and we will prove that Judy Neelley lacked — although we don't have to prove *Page 506 
it — we will prove that Judy Neelley never had the intent to kill anyone.'
 "Mrs. Neelley's defense was a combination of duress, Alabama Code 1975, § 13A-3-30, the battered woman syndrome, Annot., 18 A.L.R. 4th 1153 (1982), and coercive persuasion, Delgado, Ascription of Criminal States of Mind: Toward a Defense Theory for the Coercively Persuaded ('Brainwashed') Defendant, 63 Minn.L.Rev. 1 (1978); Dressler, Professor Delgado's 'Brainwashing' Defense: Courting a Determinist Legal System, 63 Minn.L.Rev. 335 (1979); Delgado, A Response to Professor Dressler, 63 Minn.L.Rev. 361 (1979). See also United States v. Hearst, 412 F. Supp. 863
(N.D.Cal. 1975); United States v. Hearst,424 F. Supp. 307 (N.D.Cal. 1976), affirmed, 563 F.2d 1331
(9th Cir. 1977), cert. denied, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978); People v. Manson, 61 Cal.App.3d 102, 132 Cal.Rptr. 265 (1976), cert. denied, Manson v. California, 430 U.S. 986, 97 S.Ct. 1686, 52 L.Ed.2d 382 (1977).
 "The defense was that Alvin had subjected Mrs. Neelley to such violent and gross mental, emotional, physical, and sexual abuse that she would have done anything, and did do everything he asked. A picture was painted, in the terminology used at trial, of Alvin as 'Frankenstein' and Mrs. Neelley as 'The Bride of Frankenstein.' The jury was exposed to accounts of 'putrid, pornographic, degrading, disgusting sex' as Mrs. Neelley testified how she had been dominated, manipulated, and trained like an animal. She described herself as feeling like 'a piece of meat' and it was argued that she had been reduced to a 'nonhuman.'
 "The trial judge was very liberal in allowing the defense to present its case to the point where finally the District Attorney protested that 'the Court had been almost to the state of disbelief in being lenient.' Even though Alvin Neelley did not testify, time and time again the defense was permitted to prove what he had said. Only by showing that Mrs. Neelley was an animal, a puppet, acting without intent or thought, could the defense hope to sustain its theory of coercion and duress."
Neelley v. State, 494 So.2d 669, 676-77 (Ala.Cr.App. 1985) affirmed, 494 So.2d 697 (Ala. 1986). (Emphasis added.)
The record indicates that her attorney believed that the appellant had mental problems and that he had her evaluated by state mental health workers; however the evaluation submitted by these mental health experts made no reference to the "battered woman syndrome." Her trial attorneys testified that they consulted with three other mental health experts, and one of the attorneys testified that he spoke to one of those experts on almost a daily basis, but that neither he nor the expert ever mentioned "the battered woman syndrome." The record indicates that the attorneys researched the psychological concepts of "learned helplessness" and "the Stockholm syndrome" and argued during trial that Mrs. Neelley was a victim of one or both of these syndromes. Her attorney testified that he was contacted after trial by individuals familiar with the "battered woman syndrome" and that was the first time he had heard the term. Cf. Kennedy v. State, 545 So.2d 214, 217-18
(Ala.Cr.App.), cert. denied, 493 U.S. 900, 110 S.Ct. 258,107 L.Ed.2d 207 (1989) (attorneys' failure to require DNA fingerprinting did not constitute ineffectiveness, because the process was a recent phenomenon, and trial counsel testified that he had never heard of DNA fingerprinting at the time of the petitioner's trial). Her attorney testified that once he had been contacted, he located experts and case law on the "battered woman syndrome" and that he argued to the trial court during the hearing on the motion for new trial that Neelley be granted a new trial based on this evidence. He also introduced the testimony of an expert on the subject at the hearing.
In its order, the trial court found no error in the attorneys' failure to introduce evidence as to the "battered woman syndrome," during the guilt phase, stating as follows:
 "The court finds that counsel's failure to adequately investigate, prepare and present a defense based on the battered woman syndrome did not prejudice petitioner *Page 507 
during the guilt phase of the trial because the only legal theory upon which petitioner's treatment by her husband was material was mitigation of the sentence. The Alabama Court of Criminal Appeals has analyzed the relevance of abuse suffered by petitioner as follows:
 " 'There are four conceivable legal issues upon which evidence of the abuse suffered by Mrs. Neelley might have been relevant, namely: (1) duress, (2) insanity, (3) diminished capacity, and (4) mitigation of punishment.
 " 'The first, duress, is unavailable as a defense to Mrs. Neelley . . .
 " 'While the second, insanity, has been used as a defense in other cases dealing with battered women . . . there was absolutely no evidence — expert or lay — presented by the defense that Mrs. Neelley was legally insane. . ..
 " 'The third legal theory, diminished capacity, is not recognized as a defense in Alabama. . . .
 " 'Finally, the only legal theory upon which Mrs. Neelley's alleged treatment by her husband was relevant was the one the jury properly considered — mitigation of sentence.
 "Neelley v. State, 494 So.2d 669, 681-82
(Ala.Cr.App. 1985), aff'd, 494 So.2d 697 (Ala. 1986), cert. denied, 480 U.S. 926 [107 S.Ct. 1389, 94 L.Ed.2d 702] (1987).' "
The appellant has failed to establish either that the attorneys' performance fell below a level of competent assistance or that she was prejudiced by her attorneys' failure to present evidence concerning the "battered woman syndrome." "While the ability to think creatively can be a great asset to trial lawyers, lawyers rarely, if ever, are required to be innovative, but rather to perform within the wide range of conduct that encompasses the reasonably effective representation mandated by the Constitution." Pitts v. Cook,923 F.2d 1568, 1574 (11th Cir. 1991).
 "Although the Sixth Amendment does impose on counsel an affirmative duty to investigate, this Court is hesitant to announce any mechanical rule that makes that duty absolute. Counsel's obligation is to conduct a 'substantial investigation into each of the plausible lines of defense.' Strickland, 466 U.S. at 681, 104 S.Ct. at 2061.
 "A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made. . . . So long as the error does not impinge upon the 'proper functioning of the adversarial process,' it will not pose a constitutional question under the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2063."
Ex parte Womack, 541 So.2d 47, 71 (Ala. 1988). Clearly, the appellant's attorneys raised the defense presented by this syndrome although they did not refer to it as the "battered woman syndrome" defense. Moreover, even when evidence was admitted concerning this syndrome during the hearing on the motion for a new trial and the hearing held on this Rule 20 petition, there was testimony that, in the overwhelming majority of cases dealing with the battered woman syndrome, the abused woman turns her wrath on the abuser. In fact, one of the experts testified that she was not aware of a situation where the syndrome had led to the torture and murder of an innocent, uninvolved third party. Therefore, the appellant has failed to prove that she received ineffective assistance of counsel on this ground.
As to the appellant's argument that the sentencing phase evidence on this subject should have been introduced as mitigation, the trial court determined that the attorneys' performance was ineffective for failing to have presented this syndrome as a mitigating circumstance; however, it held that the appellant failed to satisfy the prejudice prong ofStrickland v. Washington, supra, because the jury returned an advisory verdict of life imprisonment without parole, and the trial court stated that, even if evidence of the syndrome had been presented, it would not have changed his decision to overrule the jury's verdict. In its order, the trial court rejected the appellant's claim, stating:
 "Petitioner asserts that counsel should have presented testimony about the battered woman syndrome at the sentencing *Page 508 
hearing before the judge. The court agrees with this assertion, but finds that such evidence would not have changed the sentence imposed and that counsel's deficiency in failing to present such evidence, therefore, did not prejudice petitioner's defense.
 "The evidence establishes that counsel was aware of the battered woman syndrome at the time of the sentencing hearing before the judge, even though he had not been aware of it at earlier stages of the trial. Counsel testified that publicity generated by the trial caused persons to contact him volunteering information about the battered woman syndrome. Under these circumstances, the standard of 'reasonable professional assistance' required that counsel present evidence of the battered woman syndrome at the sentencing hearing, for such evidence was obviously pertinent and significant on the sentencing decision to be made by the judge. It does not follow, however, that such evidence would have produced a different sentencing result.
 "Extensive testimony about the battered woman syndrome has been presented in this proceeding and at previous post-trial hearings in this case. Testifying in support of the present petition was Dr. Lenore Walker, recognized as one of the foremost authorities in the country on the battered woman syndrome. Dr. Walker testified that a battered woman is a woman who is physically, sexually, and/or psychologically abused by a man with whom she is in a relationship in order for him to get her to do what he wants without regard for her desires or needs in the situation, and that the battered woman syndrome is a collection of psychological symptoms that sometimes develop in a woman who has been battered.
 "Based upon extensive conversations with petitioner and the results of tests administered to her, Dr. Walker expressed the opinion that petitioner was a severely battered woman, that she was acting out her husband's wishes, and that her criminal acts were committed as a way of coping with that abuse and protecting herself.
 "Studies by Dr. Walker and others show that an alarming number of women in our society are victims of spousal abuse, and that many of them react in ways consistent with the battered woman syndrome. In a growing number of cases, the law has recognized the battered woman syndrome in judging the culpability of women who kill their batterers. Such recognition is entirely consistent with the legal concepts of self-defense and self-protection. A major distinguishing fact, however, between these cases and the one before the court is that the petitioner did not choose to kill her batterer. She chose, instead, to kill an innocent third party, a choice which falls outside any acceptable notion of self-protection. The battered woman syndrome offers no plausible explanation for that choice, and the court is unconvinced that the battered woman syndrome provides any reason for mitigating petitioner's sentence. Moreover, there is no reason to think that this court would have been convinced otherwise at the sentencing hearing even if counsel had presented evidence of the battered woman syndrome at that time. Counsel's failure to present evidence of the battered woman syndrome at the sentencing hearing did not prejudice petitioner's defense and does not provide grounds for relief from the sentence."
Without addressing the trial court's determination concerning the deficiency of the attorneys' performance, see Duren v.State, 590 So.2d 360, 366 (Ala.Cr.App. 1990), affirmed,590 So.2d 369 (Ala. 1991), cert. denied, ___ U.S. ___,112 S.Ct. 1594, 118 L.Ed.2d 310 (1992) (an attorney's decision not to present certain evidence as mitigation is a tactical one and is due a very strong presumption of correctness), it is clear that the appellant was not prejudiced by the attorneys' failure to present any evidence concerning this syndrome at sentencing, because the trial court in its order stated that it would not have affected his decision. Therefore, we find that the appellant did not receive ineffective assistance of counsel because of her attorneys' failure to introduce any evidence of the battered woman syndrome as mitigation during her sentencing hearing. *Page 509 
 VII
The appellant argues that her attorneys performed ineffectively by failing to raise a number of claims in any of the previous proceedings or on appeal, thereby causing the claims to be procedurally barred in this second Rule 20 petition. However, a review of these claims indicates that each of them are meritless; therefore, her attorneys' failure to raise them previously did not constitute ineffective assistance of counsel. See Palmes v. Wainwright, 725 F.2d 1511, 1523 (11th Cir.), cert. denied, 469 U.S. 873, 105 S.Ct. 227,83 L.Ed.2d 156 (1984).
Most of the alleged errors to which the appellant argues the attorneys should have objected were reviewed by this court on direct appeal pursuant to the plain error rule, Rule 45A, A.R.App.P., because as they concerned matters apparent from the record and were found not to have been erroneous. Neelley v.State, supra at 680. In fact, the record indicates that the appellant's attorney did object to certain of these alleged errors. These alleged errors are as follows: an allegedly improper burden of proof instruction by the trial court; the introduction into evidence of the appellant's taped confession, photographs of the victim, and testimony of the victim's case worker and of other people whom the appellant attempted to pick up, or succeeded in picking up, for her husband; the admission of the appellant's statements to the police; the trial court's application of the aggravating circumstances that the crime was especially heinous, atrocious, or cruel when compared to other capital crimes; the inclusion on the jury of persons who had fixed opinions about the case; certain alleged prosecutorial misconduct; the trial court's override of the jury verdict; and the admission of victim impact evidence. Because we have previously found none of these errors to constitute reversible error, the attorneys were not ineffective for failing to object to them. Palmes v. Wainwright, supra.
The appellant also alleges that her attorneys were ineffective for failing to seek a change of venue and for failing to request individual voir dire. The record indicates that the veniremembers were examined in panels of 20, and both trial attorneys testified that they conducted extensive investigation into the backgrounds of the potential jurors. Moreover, the record indicates that the veniremembers were thoroughly examined and that many of them were examined individually. As to this claim, the trial court stated, "It is without dispute that trial counsel conducted both an extensive pretrial investigation of each member of the jury venire in a thorough and exhaustive voir dire examination. As a result of both the pretrial investigation and voir dire examination, trial counsel had ample information to assist [them] in selecting a fair and impartial jury." The appellant has failed to demonstrate any ineffectiveness of counsel on this ground.
The appellant also argues that her trial attorneys should have moved for a change of venue because of the intense pretrial publicity in DeKalb County. However, one of the attorneys testified that he decided not to make such a motion, as part of his trial strategy, because he knew that there had never been a death penalty verdict returned in DeKalb County and because the jury returned an advisory verdict of life imprisonment without parole in this case, so far as he knew, there still has never been such a verdict. He also testified that he was better able to conduct an extensive investigation into the jury panel in DeKalb County. The trial court properly found that the decision not to move for a change of venue was made pursuant to "a reasonable trial strategy, and was not a deficiency in his representation of petitioner."
"In conclusion, there was little that trial counsel could have done to prevail in this case. Even if certain aspects of [their] trial strategy are deemed unreasonable, this did not prejudice [appellant] because of the overwhelming evidence against [her]." Zamora v. Dugger, supra at 961.
The judgment of the trial court denying the relief requested in the appellant's Rule 20 petition is affirmed.
AFFIRMED.
All Judges concur. *Page 510